# *Acevedo v. City of Miami*

United States Court of Appeals for the Eleventh Circuit

August 26, 2026, Filed

No. 24-12650

**Reporter**

2026 U.S. App. LEXIS 26070 *; 2026 LX 427952

HUBERT ARTURO ACEVEDO, Plaintiff-Appellee, versus CITY OF MIAMI, et al., Defendants, ALEX DIAZ DE LA PORTILLA, MANUEL REYES, in his capacity as Personal Representative of the Estate of Manuel Ernesto Reyes, ARTHUR NORIEGA, JOE CAROLLO, individually, Defendants-Appellants.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [*1]** Appeals from the United States District Court for the Southern District of Florida. D.C. Docket No. 1:22-cv-20224-KMW.

**Counsel:** For HUBERT ARTURO ACEVEDO, Plaintiff - Appellee: Marcos Daniel Jimenez, Leon Cosgrove Jimenez, LLP, MIAMI, FL; Sam Linn, Leon Cosgrove Jimenez, LLP, NEW YORK, NY.

For ALEX DIAZ DE LA PORTILLA, Defendant - Appellant: Thomas A. Tucker Ronzetti, III, Tucker Ronzetti, PA, MIAMI, FL; Javier Asis Lopez, Vedder Price, PC, MIAMI, FL; Michael Robert Lorigas, Kozyak Tropin & Throckmorton, LLP, CORAL GABLES, FL; Kerri McNulty, City of Miami-City Attorney, MIAMI, FL.

For MANUEL REYES, in his capacity as Personal Representative of the Estate of Manuel Ernesto Reyes, Defendant - Appellant: Frank Quintero, Jessica Fonseca-Nader, Frank Quintero, Jr., PA, CORAL GABLES, FL; Kerri McNulty, City of Miami-City Attorney, MIAMI, FL; Jose Manuel Quinon, Jose M. Quinon, PA, CORAL GABLES, FL.

For ARTHUR NORIEGA, Defendant - Appellant: Mason Pertnoy, Krinzman Huss & Lubetsky, MIAMI, FL; Kerri McNulty, City of Miami-City Attorney, MIAMI, FL.

For JOE CAROLLO, Defendant - Appellant: Benedict P. Kuehne, Michael Terrell Davis, Kuehne Davis Law, PA, MIAMI, FL; Kerri McNulty, City of Miami-City Attorney, **[*2]** MIAMI, FL.

**Judges:** Before WILLIAM PRYOR, Chief Judge, and BRASHER and ABUDU, Circuit Judges.

**Opinion by:** BRASHER

## Opinion

BRASHER, Circuit Judge:

This appeal is about a whistleblower, the First Amendment, and qualified immunity. According to the complaint, the defendants—Miami City Commissioners Alex Diaz de la Portilla, Manuel Reyes, and Joe Carollo, as well as City Manager Arthur Noriega—suspended and terminated the plaintiff, Police Chief Hubert Acevedo, in retaliation for a whistleblowing memo that he wrote to outside law enforcement agencies implicating the defendant Commissioners. The defendants moved to dismiss the complaint based on legislative and qualified immunity, and the district court denied the motion. Because the district court denied their immunity defenses, the defendants appealed.

We agree in part and disagree in part with the district court. Based on the facts in the complaint,

Page 2 of 13


which control at this stage of litigation, we determine that the defendant Commissioners are not entitled to qualified immunity. On the other hand, Manager Noriega is. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

**I**.

This appeal comes to us from the district court's denial of the defendant City Commissioners', and Manager **[*3]** Noriega's, motions to dismiss. Because the appeal arises from that stage of litigation, we accept all factual allegations in the complaint as true. *Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010)*. And we take all inferences in favor of the plaintiff. *Id.* The following facts are based on Acevedo's complaint, read in light of that standard.

*A*.

This dispute began in early 2020, when the Miami City Commission passed Resolution No. R-20-0034. The Resolution instructed the City Commission or the City Manager to direct most criminal investigations of City elected officials to Florida state law enforcement or the FBI. The City Commission ostensibly adopted the Resolution to prevent the appearance of corruption.

Miami Mayor Francis Suarez and City Manager Noriega later recruited Acevedo to serve as the Miami Chief of Police. They recruited him due to his reputation as a reformist, given that there was a "need to reform" the Miami Police Department "and [to] change the culture of the department." Doc. 1 at 3.

Shortly after Acevedo assumed his position, certain Commissioners—namely, defendant Commissioners Diaz de la Portilla, Reyes, and Carollo—improperly involved themselves in an internal police investigation. Acevedo ordered an investigation **[*4]** into an alleged breach of operational security committed by officer Luis Camacho. Based on the investigation, Acevedo relieved Camacho of duty. The City Commission then summoned Acevedo before them. At the ensuing public meeting, Commissioners Diaz de la Portilla, Reyes, and Carollo berated him for suspending Camacho without due process. Carollo said: "[w]hile I have been walking very softly, I carry a hell of a big stick, and it don't matter what time of the year it is, whether it is election time, or not election time." Doc. 1 at 15. Even after this meeting, the defendant Commissioners continued pressuring Acevedo in private, with Diaz de la Portilla even offering to support Acevedo for Sheriff of Miami-Dade County if he just did "the right thing on Camacho and g[o]t him back." *Id.* at 17.

Even more alarmingly, Acevedo witnessed certain City Commissioners using the police force to settle personal, political feuds. For example, several city officials warned Acevedo that Commissioner Carollo had a vendetta against Bill Fuller, a local businessowner, for backing Carollo's political opponent. Manager Noriega, Commissioner Diaz de la Portilla, and Mayor Suarez all told Acevedo to avoid **[*5]** patronizing Fuller's business lest he attract Carollo's ire. And Noriega directed Acevedo to investigate any potential wrongdoing by Fuller's businesses, suggesting that this order came at the behest of Carollo.

When the Division of Alcohol, Beverages, and Tobacco, in tandem with the Miami Police Department, eventually investigated one of Fuller's businesses, the police report stated that the business had received a written warning of liquor law violations. This statement was in error, as no violation had been found. When Fuller's associates read the report, they alerted Acevedo of this error. Acevedo directed one of his officers, Officer Morales, to investigate the error. But Acevedo later learned that Morales defied this order and did not follow up regarding either this error or the investigation into Fuller's businesses.

Page 3 of 13


Later, the Miami Police Department conducted two more unannounced inspections of Fuller's businesses. During one of these inspections, the police arrested the general manager for allegedly operating an illegal nightclub. The State Attorney's Office ultimately dropped the resultant charges. And throughout this time, Carollo continued to pressure Acevedo to aggressively **[*6]** investigate Fuller's businesses, alleging that Fuller was bribing code enforcement officials and police officers. But neither Acevedo nor key Internal Affairs officers ever saw any evidence to support this claim.

Unrelated to the incidents involving Fuller, the Commission summoned Acevedo to appear before another public Commission meeting. There, Carollo and Diaz de la Portilla named specific bars and establishments that they wanted Acevedo to investigate. And Diaz de la Portilla later emailed Acevedo to reiterate which businesses the police should target. But at no time did he suggest that the City had received complaints about these businesses, nor did he provide Acevedo with any evidence that these establishments had violated the law.

During and after the above events, Acevedo warned Mayor Suarez and Manager Noriega about the improprieties that he had witnessed. He stressed to them that he was alarmed by the Commissioners' involvement with the internal Camacho investigation and that he was concerned that the Commissioners were acting beyond their authority. He further alerted them to the fact that the defendant Commissioners were attempting to intimidate him and to use the Police **[*7]** Department to advance personal agendas. Suarez and Noriega told Acevedo that this was just the way things worked in Miami.

*B.*

Alarmed, Acevedo wrote and circulated a "whistle-blowing memorandum."[1] Doc. 1 at 23. He sent this memo to Suarez, Noriega, the Miami-Dade State Attorney's Office, and the FBI. He did so because he felt that he could not investigate any wrongdoing by the Commissioners, hamstrung as he was by the 2020 Resolution. The memo included the details relayed above, describing how certain Commissioners had "attempted to weaponize the [Police Department], interfered with [Police Department] internal and external investigations, and impeded reform at the [Department]." *Id.* at 24. The memo leaked to the media.

Even after it was leaked to the press, Acevedo's memo did not disrupt the functioning of the Police Department or the municipal government. Indeed, the Commission has no "authority to manage the [Police Department] or otherwise dictate [Police Department] decisions." *Id.* at 4. As a result, the memo could not, and in fact did not, have any negative effect on the Commission's ability to run the department—a power which it did not have.

Nevertheless, upon receiving the **[*8]** memo, Noriega called Acevedo. He told Acevedo:

> So you've gone after [the defendant Commissioners], and [you'd] better be sure you have a kill shot because if you don't, you better not take it. Maybe it's because you're an outsider it's easier for you. Trust me, I came from my last job where I had a hell of a lot more autonomy than I have here, but I realize and accept my limitations.

Doc. 1 at 24.

The Commission then held a special meeting. The defendant Commissioners—Diaz de la Portilla, Reyes, and Carollo—launched into a series of

---

[1] Here, based on the "incorporation by reference" doctrine, the contents of Acevedo's whistleblowing memo are included in the complaint. *See* [Swinford v. Santos, 121 F.4th 179, 187 (11th Cir. 2024)](#) ("[A] district court may consider evidence attached to a motion to dismiss without converting the motion into a motion for summary judgment if the document is (1) central to the plaintiff's claim; and (2) undisputed, meaning that its authenticity is not challenged." (citation modified)).

heated attacks on Acevedo and his performance. Carollo even raised false allegations about Acevedo that stemmed from before his time as Chief of Police. And the Commissioners played video of Acevedo in an Elvis costume, noting his tight pants, and compared Acevedo to former Chief of Police Don Warshaw, a convicted felon. At the end of this meeting, the Commission passed a resolution to investigate the wrongdoing alleged in Acevedo's memo.

The Commission subsequently held another special meeting to discuss Acevedo. At this meeting, they continued their attacks on him, arguing that he was "no reformer" and noting that he was "not a Cuban-American from Miami." **[*9]** Doc. 1 at 27. They then voted to eliminate funding for high-ranking positions within the Miami Police Department.

In the wake of these meetings, Noriega suspended Acevedo with pay pending a termination hearing. He provided Acevedo with a memo that outlined the reasons for his suspension. The complaint dismisses these reasons as pretextual. And when Noriega provided Acevedo with the memo, he told Acevedo that that Acevedo had "gone too far" and that he, Noriega, needed to "stop the bleeding" by suspending him. Doc. 1 at 28-29. Noriega then scheduled Acevedo's termination hearing for just a few days later, on a day when Acevedo's primary lawyers were unavailable. When Acevedo asked if the hearing could be pushed back a few days so that his lawyers could be present, Noriega refused.

At the ensuing termination hearing, Noriega called four witnesses. As Noriega and Acevedo were questioning these witnesses, the Commissioners—ostensibly serving as impartial jurors in the hearing—repeatedly inveighed against Acevedo and badgered the witnesses. One of the non-defendant Commissioners even informed the others that they were revealing their bias. Unsurprisingly, at the conclusion of the meeting, **[*10]** the Commissioners terminated Acevedo. According to the complaint, they did so "because [Acevedo] had reported their misconduct to City Manager Noriega, Mayor Suarez, the State Attorney's Office, and the FBI." Doc. 1 at 30.

After Acevedo was fired, Officer Morales, the same officer who earlier defied Acevedo's instruction to investigate the error in the police report on Fuller's business, was appointed interim Chief. The Commissioners "chose Officer Morales" for the role "because he carries out their orders without question and allows [them] to abuse [Police Department] resources to carry out personal agendas and vendettas." Doc. 1 at 11. And when Morales was sworn in as interim Chief, at a ceremony attended by the defendant Commissioners and Manager Noriega, Carollo played the theme music from *The Godfather*.

*C.*

Acevedo sued the three defendant Commissioners—Commissioners Diaz de la Portilla, Reyes, and Carollo—and Manager Noriega for retaliation in violation of Acevedo's First Amendment rights, under 42 U.S.C. § 1983.[2] In response, each individual defendant moved for dismissal based on qualified immunity. Two defendant Commissioners also moved for dismissal based on legislative immunity.

After a hearing, the district **[*11]** court denied all motions to dismiss. The individual defendants timely filed notices of appeal.

**II.**

This Court reviews the district court's denial of a motion to dismiss based on immunity *de novo.* Keating, 598 F.3d at 762. When reviewing such a denial, as discussed above, we accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Id.*

---

[2] Though not relevant here, Acevedo also sued the City of Miami under the Florida Whistleblower Act, Fla. Stat. § 112.3187.

Page 5 of 13


**III.**

First, we discuss the defendant Commissioners' argument that they are entitled to legislative immunity. Second, we turn to their argument that they are shielded by qualified immunity. Third, we turn to Manager Noriega's contention that he is entitled to qualified immunity. We determine that, although the defendant Commissioners do not enjoy the protection of either legislative or qualified immunity at this stage, Manager Noriega is entitled to qualified immunity.

*A.*

We begin with legislative immunity. Commissioners Carollo and Reyes argue that their decision to terminate Acevedo is protected by legislative immunity. Although Commissioner Diaz de la Portilla purports to raise this argument on appeal, he did not argue legislative immunity below. As a result, he has forfeited the defense of legislative immunity. *See Scott v. Taylor, 405 F.3d 1251, 1258 (11th Cir. 2005)* (Jordan, **[*12]** J., concurring) (noting that "[l]egislative immunity is an affirmative defense which can be waived or forfeited, and, unless raised, does not affect the power of a federal court to adjudicate." (citing *Kingman Park Civic Ass'n v. Williams, 348 F.3d 1033, 1039, 358 U.S. App. D.C. 295 (D.C. Cir. 2003)*)). Regardless, none of the defendant Commissioners are entitled to legislative immunity.

This Court has held that "[a]bsolute legislative immunity extends only to actions taken within the sphere of legitimate legislative activity." *Brown v. Crawford County, 960 F.2d 1002, 1011 (11th Cir. 1992)* (citation modified). When considering whether the relevant actions fall within this sphere, we must determine whether the actions were "legislative" in nature or "executive" or "administrative" in nature. *Littlejohn v. Sch. Bd. of Leon Cnty., 132 F.4th 1232, 1242 (11th Cir. 2025)*. Legislative acts generally apply to a broad swathe of society. *Id.* But executive or administrative acts, to which legislative immunity does not attach, "apply to a limited number of persons and typically arise from the ministerial or administrative activities of members of the executive branch." *Id.* (citation modified). Put otherwise, "if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature." *Crymes v. DeKalb County, 923 F.2d 1482, 1485 (11th Cir. 1991)*.

Because "employment and personnel decisions are administrative in nature," legislative immunity **[*13]** does not apply here. *Smith v. Lomax, 45 F.3d 402, 405 (11th Cir. 1995)*. Terminating Acevedo was an employment and personnel decision. It "appl[ied] to a limited number of persons and . . . ar[ose] from the ministerial [and] administrative activities" of the Commission. *Littlejohn, 132 F.4th at 1242* (citation modified). Therefore, the district court did not err in denying Reyes's and Carollo's motion to dismiss based on legislative immunity.

*B.*

Having determined that the defendant Commissioners are not entitled to legislative immunity, we now discuss whether they are entitled to qualified immunity. Though this is a much closer question, we determine that—at this stage of litigation—they are not.

The qualified immunity test is a familiar one. "To obtain a dismissal based on qualified immunity, a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Echols v. Lawton, 913 F.3d 1313, 1319 (11th Cir. 2019)* (citation modified). If the official was acting within the scope of his discretion, the burden shifts to the plaintiff to overcome qualified immunity. *Mikko v. City of Atlanta, 857 F.3d 1136, 1144 (11th Cir. 2017)*. And for a plaintiff like Acevedo to carry this burden, he must satisfy both parts of the qualified immunity analysis. He must plead facts

establishing that the official violated **[*14]** a statutory or constitutional right. *Ashcroft v. al-Kidd, 563 U.S. 731, 735, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*. And he must prove that the right was "clearly established," or that the "state of the law at the time of the violation" gave the "officials fair warning that their conduct was unconstitutional." *Hughes v. Locure, 166 F.4th 121, 128 (11th Cir. 2026)* (citation modified).

Because no one contests that the Commissioners were acting within the scope of their discretion when they terminated Acevedo, the burden shifts to him. The next question is whether he has satisfied his burden. In considering this question, we again must accept all factual allegations in the complaint as true and draw all reasonable inferences in Acevedo's favor. *Keating, 598 F.3d at 762*. When we do so, we determine that Acevedo has carried his burden and that qualified immunity does not protect the defendant Commissioners.

1.

We begin with the first qualified immunity element: whether the defendant Commissioners violated Acevedo's First Amendment rights. Acevedo alleges that he was terminated because he had drafted and circulated a memo alleging wrongdoing on the part of the Commissioners. We determine that, based on the facts alleged in the complaint, the defendant Commissioners impermissibly retaliated against Acevedo for his protected speech and thus violated his constitutional **[*15]** rights.

At the outset, we must decide whether Acevedo has alleged an "adverse employment action" sufficient to establish a retaliation claim. *Akins v. Fulton County, 420 F.3d 1293, 1300 (11th Cir. 2005)*. He has done so here. This Court has held that "discharges, demotions, refusals to hire or promote, and reprimands" constitute adverse employment actions. *Id.* Because the defendant Commissioners discharged Acevedo, Acevedo has established an adverse employment action.

We then turn to examining the nature of Acevedo's speech. Deciding whether the First Amendment protects a public employee's speech requires "a careful balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of . . . an employer[] in promoting the efficiency of the public services it performs through its employees." *Lane v. Franks, 573 U.S. 228, 231, 134 S. Ct. 2369, 189 L. Ed. 2d 312 (2014)* (citation modified). Therefore, to establish First Amendment retaliation, an employee like Acevedo must prove the following: (1) "that the speech was made as a [private] citizen"; (2) that the speech was "on a matter of public concern" or importance; (3) that "the employee's free speech interest . . . outweigh[s] the employer's interest in effective and efficient fulfillment of its responsibilities"; and (4) that "the speech . . . **[*16]** played a substantial part in the adverse employment action." *Green v. Finkelstein, 73 F.4th 1258, 1263 (11th Cir. 2023)*.

It is only the first three inquiries that concern us here. Those are questions of law. *Id.* The fourth inquiry, whether the speech played a substantial role in Acevedo's termination, is a question of fact. As such, because we are at the motion to dismiss stage, we accept as true Acevedo's well-pleaded assertion—that the speech was *the* reason he was fired.

a.

We start at the beginning, with the first inquiry. Whether Acevedo spoke as a private citizen, in which case First Amendment protections would attach, or as a public employee, in which case they would not, depends on "whether the speech at issue is . . . ordinarily within the scope of [his] duties." *Lane, 573 U.S. at 240*. For speech to be the speech of a public employee, it must be "speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of [his] employment, not merely speech that concerns the ordinary responsibilities of [his] employment." *Alves v. Bd. of Regents of the Univ. Sys. of Ga., 804 F.3d 1149, 1162 (11th Cir. 2015)*. Indeed, "the

Page 7 of 13


mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane, 573 U.S. at 240*.

Because Acevedo's whistleblower memo **[*17]** was not, based on the facts in the complaint, "ordinarily within the scope of [Acevedo's] duties," it was the speech of a private citizen. Doc. 1 at 39. In the complaint, Acevedo notes that he "had no administrative, disciplinary, or investigative authority over the Commission or its members." *Id.* He further stresses that the 2020 Resolution had removed from his authority the responsibility for investigating wrongdoing committed by City officials. *Id.* at 40. As a result, blowing the whistle to law enforcement over the defendant Commissioners' misconduct was outside of Acevedo's ordinary duties.

This Court has determined, at the motion to dismiss stage, that substantially similar speech was speech of a private citizen. *See Carollo v. Boria, 833 F.3d 1322 (11th Cir. 2016), abrogated on other grounds by Gilmore v. Ga. Dep't of Corr., 111 F.4th 1118 (11th Cir. 2024)*. In *Carollo*, the City Manager of Doral, Florida—the same Joe Carollo who is a defendant here—was terminated after alerting federal law enforcement to violations of state and federal law committed by members of the City Council. *Id. at 1326*. There, Carollo alleged that reporting these matters was not within his ordinary duties. *Id. at 1330*. This Court determined that these assertions in the complaint were sufficient to establish that Carollo was speaking as a private **[*18]** citizen. *Id.* Indeed, the *Carollo* Court noted that, because "formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform," discovery would be necessary to "illuminate exactly" the scope of Carollo's ordinary duties. *Id.* (citation modified).

A few years after *Carollo*, this Court reiterated that speech like Acevedo's memo is the speech of a private citizen. In *King v. Board of County Commissioners*, we stressed that when an employee "spoke on something beyond his job duties to persons outside his workplace," it was the speech of a private person. *916 F.3d 1339, 1350 (11th Cir. 2019)*. Here, Acevedo sent a memo to the State Attorney's Office and the FBI, persons outside his workplace, to complain of misconduct by the City Commissioners, which the 2020 Resolution removed from his investigatory duties. The fact that he did so is enough to prove that he spoke as a private person.

In response, the defendant Commissioners argue that Acevedo's memo was part of his ordinary job duties (1) because part of the memo was devoted to complaining about the Commissioners' involvement in police matters, which were within his purview, and (2) because, notwithstanding the 2020 Resolution, it is the Police **[*19]** Chief's duty to report crime. In fact, the defendant Commissioners argue that Acevedo "had a *heightened* duty to report what others would investigate." Appellant Commissioners' Br. at 30 (emphasis added). Both arguments fail.

The first argument is baseless, as it attempts to minimize the memo as simply a complaint about workplace mismanagement. But we must construe the allegations in the complaint in favor of Acevedo. We cannot, therefore, conclude that Acevedo would report a mere workplace complaint to the FBI. By doing so, we conclude that Acevedo intended to report misconduct, as he asserts in his complaint.

As for the second argument, it is foreclosed by *Carollo, 833 F.3d at 1331*. In *Carollo*, this Court rejected the idea that public officials have an "implied duty" to report misconduct. *Id.* This Court so held because to do otherwise "would eviscerate the role of the First Amendment in protecting public employees who act as whistleblowers." *Id.* (applying *Lane, 573 U.S. at 240-41*).

b.

We now turn to the second inquiry: whether

Page 8 of 13


Acevedo's speech addressed a matter of public concern. In doing so, we consider whether the speech can "be fairly considered as relating to any matter of political, social, or other concern to the community" or if it "is a subject **[*20]** of legitimate news interest." *Snyder v. Phelps, 562 U.S. 443, 453, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011)* (citation modified). When making this determination, we look to "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers, 461 U.S. 138, 147-48, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)*. Of these, the "most important factor" is the content of the speech. *Mitchell v. Hillsborough County, 468 F.3d 1276, 1284 (11th Cir. 2006)*. And we ask whether "the main thrust of the speech in question is essentially public in nature or private." *King, 916 F.3d at 1347*.

The main thrust of the speech in question—Acevedo's memo—is essentially public. The memo listed several instances in which the defendant Commissioners attempted to weaponize the police department in pursuit of their personal vendettas. The memo also alleged other, unrelated abuses of power on their part. And exposing corruption and abuses of power is a quintessentially public matter. *See* *Lane, 573 U.S. at 241* ("[C]orruption in a public program . . . obviously involves a matter of significant public concern."); *see also* *Stanley v. City of Dalton, 219 F.3d 1280, 1289 (11th Cir. 2000)* ("[T]here can be no doubt that corruption in a police department is an issue of public concern.").

In response, the defendant Commissioners argue that the memo's "main thrust was to promote Acevedo's interest in independently running the police department." Appellant Commissioners' Br. at 32. And in support of this argument, they contend **[*21]** that the memo's (1) content was primarily about Acevedo's interest in, and difficulty with, managing the police department free of interference, (2) form was a workplace report delivered to Acevedo's superiors during a workplace dispute, and (3) intent was to be circulated privately, not publicly. We disagree.

First, though much of the memo focuses on the defendant Commissioners' interference with police affairs, that concern is framed as a public corruption issue. That is, the complained-of interference is cited as evidence of the defendant Commissioners' misconduct. This context confirms that the memo focuses on a matter of public concern—corruption—instead of Acevedo's primary interest in managing his own department.

Second, it is at best misleading to dismiss the memo as a mere workplace report delivered to Acevedo's superiors. Though addressed to Mayor Suarez and Manager Noriega, Acevedo also sent the memo to the State Attorney's Office and the FBI. It would be quite a stretch, indeed, to describe a memo to outside state and federal law enforcement as simply an internal workplace report. And his decision to send the memo to outside law enforcement confirms that he meant for it to **[*22]** be more than a simple internal catalogue of grievances.

Third, the private nature of the memo does not, contrary to the defendant Commissioners' arguments, render the content a matter of private concern. This Court has found that a police officer privately reporting misconduct to a state law enforcement agency is speech of a public nature. *Fikes v. City of Daphne, 79 F.3d 1079, 1084 (11th Cir. 1996)*; *see also* *Martinez v. City of Opa-Locka, 971 F.2d 708, 712 (11th Cir. 1992)* (holding that a private report of government misconduct to state law enforcement was speech of a public nature). The fact that Acevedo sent the memo privately, then, is of relatively little significance. Such evidence would simply serve as proof of a speech's private nature when the content of the speech already indicates as much. *See* *Pearson v. Macon-Bibb Cnty. Hosp. Auth., 952 F.2d 1274, 1278-79 (11th Cir. 1992)* (finding that the private nature of speech merely reinforced the conclusion that the contents of a plaintiff's speech only "concerned the circumstances of her own employment").

We believe Acevedo's memo was speech on a

matter of public importance.

c.

Because Acevedo's memo was the speech of a private citizen on a matter of public importance, we now turn to applying the *Pickering* balancing test. *Green, 73 F.4th at 1263*. This test requires us to balance "the interests of the employee, as a citizen, in commenting upon matters of public concern **[*23]** and the interest of an employer in promoting the efficiency of the public services it performs through its employees." *Id. at 1267* (citing *Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)* (citation modified)). Factors that the Court can consider include "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time[,] and place of the speech, and (3) the context within which the speech was made." *Belyeu v. Coosa Cnty. Bd. of Educ., 998 F.2d 925, 928 (11th Cir. 1993)* (quoting *Morales v. Stierheim, 848 F.2d 1145, 1149 (11th Cir. 1988)*). And when applying this test, the key question is "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)*.

On the limited record before us at the motion to dismiss stage, the Commissioners did not have such a justification. There is no evidence before us to suggest that Acevedo's memo in any way "impede[d] the government's ability to perform its duties efficiently." *Belyeu, 998 F.2d at 928* (quoting *Morales, 848 F.2d at 1149*). Indeed, the complaint makes allegations to the contrary. Based on the complaint, the City Commissioners had no oversight and control over the operations of the Miami Police Department. Acevedo further asserts in the complaint that the memo "did not disrupt the functioning of the [Police Department] or the City **[*24]** of Miami." Doc. 1 at 39. And the manner, time, and place of the speech, and the context within which it was made, support this assertion—Acevedo did not release the memo to the public, but sent it to a private and select group of law enforcement and supervisory officials. *See Belyeu, 998 F.2d at 928*. Consequently, we cannot say that Acevedo's private whistleblower memo, which of itself could only have interfered with the defendant Commissioners' nonexistent authority over the Police Department, meaningfully impeded the Commission's authority to perform its duties.

Further, the interests of Acevedo, as a citizen, are weighty. After all, this Court has observed that "a core concern of the [F]irst [A]mendment is the protection of the 'whistle-blower' attempting to expose government corruption." *Bryson v. City of Waycross, 888 F.2d 1562, 1566 (11th Cir. 1989)*. Therefore, because Acevedo's interests in the speech were weighty, and because the complaint alleges that the memo did not affect the government's interest in efficiently performing its duties, the *Pickering* balancing tips in Acevedo's favor.

In addition, Acevedo's speech arguably furthered the City's interests by exposing alleged corruption and misconduct. We have previously held that a government's interest in preventing whistleblower **[*25]** speech is as weak as a plaintiff's interest in exposing corruption is high. *Akins, 420 F.3d at 1304* ("[P]reventing [whistleblower] speech would not seem to aid the government's interest in efficiency, since the speech would bring the alleged wrongful practices to light and lead to more efficient provision of public services."). And we have held that exposing corruption can enhance a government's ability to efficiently provide services, given that their services may be hampered by official corruption. *See Fikes, 79 F.3d at 1084* (holding that the plaintiff's "attempts to expose police malfeasance helped further the municipality's responsibility to provide effective law enforcement services"). Thus, the defendant Commissioners face an uphill battle in tipping the balance in their favor.

In response, the defendant Commissioners argue

that (1) Acevedo's First Amendment protections are "slight" due to his policymaking role, (2) the presence of an ongoing personnel dispute between Acevedo and the Commissioners tips the balance in the Commissioners' favor, (3) the unique nature of a police force means that Acevedo's speech has little protection, and (4) the contents of the suspension memorandum establish that Acevedo's speech impeded the Commission's **[*26]** ability to do its duties. These arguments fail.

First, although "First Amendment constitutional protection is often slight" for policymaking officials, that principle is irrelevant to this dispute. *Bates v. Hunt, 3 F.3d 374, 378 (11th Cir. 1993)*. Even assuming that Acevedo was in a policymaking role, this limitation applies when a policymaking official is terminated *for his policy-based speech*. *Leslie v. Hancock Cnty. Bd. of Educ., 720 F.3d 1338, 1347 (11th Cir. 2013)*. It does not, then, justify firing a policymaking official for the kind of "whistle-blowing" speech that this Court has held lies at the heart of the First Amendment. *Bryson, 888 F.2d at 1566*. As a result, because Acevedo has adequately pleaded (1) that he was fired because of the memo he sent and (2) the memo was a whistleblower memo, the protection afforded to his speech is not the "slight" protection afforded for policy-based speech.

Second, the defendant Commissioners' argument that the ongoing personnel dispute lends their interests greater weight also fails. In making this argument, they rely on *Morales v. Stierheim, 848 F.2d 1145 (11th Cir. 1988)*. In *Morales*, we held that when an "employee's speech arises out of his own ongoing personnel dispute, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." *Id. at 1150* (citation modified). This rule goes to the "context" **[*27]** of the speech. *Id.* But the *Morales* approach supports employers *because* it helps to prove that the speech has "impeded" the employer, or will impede the employer, from fulfilling his duties. *Id. at 1150-51*. Because, as discussed above, we must take the contrary allegations of the complaint as true, whatever help *Morales* offers the Commissioners is for naught.

Third, the Commissioners argue that the "heightened need for order, loyalty, morale and harmony" in a police force afforded them "more latitude in responding to [Acevedo's speech] than [that of] other government employe[e]s." *Oladeinde v. City of Birmingham (Oladeinde II), 230 F.3d 1275, 1293 (11th Cir. 2000)*. And indeed, this Court has held that the "heightened need for order, loyalty, and harmony in a quasi-military organization such as a police or fire department" can tip the *Pickering* balance in an employer's favor. *Moss v. City of Pembroke Pines, 782 F.3d 613, 621 (11th Cir. 2015)*.

But ultimately, we reject this argument. Our precedents highlight the special or unique nature of employer interests within a police force, but they concern suits brought by rank-and-file officers against their direct superiors. *See Oladeinde II, 230 F.3d at 1293* (citing *Campbell v. Towse, 99 F.3d 820, 829-30 (7th Cir. 1996)* ("It surely cannot be doubted that individuals who work in the highest echelons of the command of a police department must be assured of the loyalty of their immediate subordinates, **[*28]** as these subordinates are entrusted with carrying out their orders, at times under the most trying conditions.")). Although police forces may be quasi-military organizations, there is not the same need for discipline and loyalty between the Police Chief and City Commissioners who wield no oversight authority over the police force.

Fourth, the defendant Commissioners point to the contents of the suspension memorandum as evidence in their favor. They argue that the suspension memorandum is included in the record here based on the "incorporation by reference" doctrine. *See Horsley v. Feldt, 304 F.3d 1125, 1134-35 (11th Cir. 2002)* (permitting the court to consider a document attached to a motion to dismiss when that document is (1) central to the

Page 11 of 13


plaintiff's claim and (2) its authenticity is not challenged). But because the suspension memo is not central to Acevedo's claim, this doctrine does not apply. Not only was the suspension memo not part of the basis for Acevedo's claim, but he also repeatedly denies the veracity of the memo's contents in his complaint. *See* Baker v. City of Madison, 67 F.4th 1268, 1277 (11th Cir. 2023) (incorporating by reference police bodycam footage when the plaintiff's allegations were based directly on the contents thereof). What's more, Acevedo adequately alleges that the suspension **[*29]** memo was pretextual and was part of a pattern by the defendant Commissioners to harass and chill whistleblowers. Because we must draw all inferences in Acevedo's favor, we cannot rely on the contents of this allegedly pretextual memo to tip the balance in the Commissioners' favor. Keating, 598 F.3d at 762.

To recapitulate, Acevedo's complaint adequately alleges that his speech did not impede the provision of government services. And he has very strong interests in his whistle-blowing speech, which we have described as sitting at the core of the First Amendment. Further, there is no evidence, based on the complaint, on the defendant Commissioners' side of the *Pickering* balance. Therefore, the *Pickering* balancing test tips in Acevedo's favor at this stage of litigation, and his interest in exposing corruption outweighs whatever hypothetical and unproven effect his memo had on the City's ability to function.

2.

We now turn to the second element of qualified immunity, and we ask whether Acevedo's rights were clearly established. The defendant Commissioners focus their arguments on the *Pickering* balance. They argue that it is not clearly established under our law that they lacked "an adequate justification for treating [Acevedo] differently from any other **[*30]** member of the general public." Garcetti, 547 U.S. at 418. We disagree.

"A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is apparent." Akins, 420 F.3d at 1305 (citation modified). Acevedo can prove as much here in three ways: (1) he can cite to "case law with indistinguishable facts clearly establishing the constitutional right"; (2) he can point to "a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right"; or (3) he can establish that the defendant Commissioners engaged in "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." Jarrard v. Sheriff of Polk Cnty., 115 F.4th 1306, 1323-24 (11th Cir. 2024).

Before applying this law to the appeal before us, it is worth reiterating the facts as they stand at this stage of litigation. Based on the complaint, we know that a public employee spoke as a private citizen on a matter of public concern, he suffered an adverse employment action because of that speech, and his speech did not disrupt the efficient provision of government services. Moreover, the employee was not fired for any legitimate reason that we might weigh in the government's favor—for example, because the speech was disruptive **[*31]** or unprofessional—but for the purpose of harassing and chilling a whistleblower.

When viewed in this light, we think "already-existing law" makes the "the unlawfulness of the conduct" apparent. Akins, 420 F.3d at 1305. Indeed, our precedent addresses a similar situation about police officers, finds a constitutional violation, and denies qualified immunity. *See* Oladeinde v. City of Birmingham (Oladeinde I), 963 F.2d 1481, 1487 (11th Cir. 1992), *overruled on other grounds by* Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit, 507 U.S. 163, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993).[3] In

---

[3] *Oladeinde I* reiterated this Court's law, then in effect, that a section 1983 claim carried a heightened pleading standard. 963 F.2d at 1485. This Court later recognized that this rule had been overruled by the Supreme Court in Leatherman, 507 U.S. at 163. Swann v. S.

*Oladeinde I*, members of the Birmingham Police Department sued several Birmingham City officials. *Id. at 1483*. The police officers alleged, "[i]n essence . . . that they [were] 'whistleblowers' and that defendants violated [the] plaintiffs' free-speech rights by retaliating against them for their efforts." *Id. at 1486*. We held that the district court correctly denied qualified immunity at the motion to dismiss stage because "the limited record . . . does not support [the] defendants' contention that . . . their interest in efficiently operating the police department outweighed plaintiffs' free-speech rights on a matter of public concern." *Id. at 1487*. We acknowledged that, "in free-speech cases . . . the employer is entitled to immunity" unless the *Pickering* balancing test "would lead to the inevitable conclusion that the retaliatory action was unlawful." **[*32]** *Id.* (citing *Dartland v. Metro. Dade County, 866 F.2d 1321, 1323 (11th Cir. 1989)*) (citation modified). But, because we were bound to "consider[] the complaint only" in the light most favorable to the plaintiff, we held that nothing in the record supported a balance in the government actor's favor and denied qualified immunity. *Oladeinde I, 963 F.2d at 1487*.

We made the same point in *Fikes v. City of Daphne*. In *Fikes*, this Court considered whether a police officer's First Amendment right had been violated, based solely on the complaint, when he had been terminated from public employment in retaliation for reporting misconduct. *79 F.3d at 1083-85*. We held that his rights had been plausibly violated, particularly because there was no allegation in the complaint to tip the *Pickering* balancing test in favor of the employer. *Id.* We did not suggest that, merely because a police officer was involved, the *Pickering* balance weighed in favor of the government at the motion to dismiss stage. Instead, we reversed the lower court's dismissal of the complaint. *Id.*

We are bound by these precedents that deny qualified immunity on analogous facts in the same procedural posture. Nevertheless, the defendant Commissioners "retain the right to assert the qualified-immunity defense at the next stage of the proceedings (and, for that matter, **[*33]** throughout the proceedings) as more facts are developed." *Oladeinde I, 963 F.2d at 1487*. It is at these later stages of litigation that the defendant Commissioners will be able to introduce evidence that they had a justification for terminating Acevedo because his speech—i.e., that his memorandum undermined morale or was disruptive or something similar. *See* *Jackson v. Humphrey, 776 F.3d 1232, 1241 (11th Cir. 2015)* (holding that, when the facts "show both a lawful and unlawful motivation for the decision made by a government official, the official is entitled to qualified immunity"). For now, however, we cannot find that the defendants had a legitimate justification for firing Acevedo because of his speech without impermissibly drawing inferences in favor of the defendant Commissioners and crediting hypothetical justifications that are not supported by anything in the record. *See* *Keating, 598 F.3d at 762*.

*C.*

We now turn to Manager Noriega, who also raises the defense of qualified immunity. Unlike the defendant Commissioners, he successfully does so. The reason is that Acevedo's claim against Noriega differs in a meaningful way from his claim against the defendant Commissioners: Noriega did not terminate Acevedo, nor was he responsible for humiliating Acevedo at City Commission meetings. Instead, **[*34]** Noriega merely suspended Acevedo with pay pending a hearing.

Noriega argues that it is not clearly established that he took adverse employment action against Acevedo at all. *Akins, 420 F.3d at 1300*. Unlike the defendant Commissioners, Noriega's qualified immunity defense doesn't turn on a hypothetical

---

*Health Partners, Inc., 388 F.3d 834 (11th Cir. 2004)*, *overruled on other grounds by* *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. None of this reasoning has any bearing on the discussion here.

Page 13 of 13


*Pickering* balance. He says that, under our caselaw at least, it is not clearly established that suspending someone until another person—here the Commissioners—can consider termination is an adverse action. We agree.

This Court has defined "adverse employment action" broadly but amorphously. We have held that any conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee" counts as such an action. *Id.* But this Court has also held that a "five-day suspension with pay pending an investigation," absent more, is *not* an adverse employment action. *Bell v. Sheriff of Broward Cnty., 6 F.4th 1374, 1379 (11th Cir. 2021)*. Even though we stressed in *Bell* that we were "not issu[ing] a broad ruling about whether a public employee's suspension with pay always constitutes or never constitutes an adverse action," we described conduct similar to Noriega's as not an adverse **[*35]** action. *Id.*

Accordingly, we hold that Noriega did not have "fair warning that [his] conduct was unconstitutional." *Hughes, 166 F.4th at 128* (citation modified). At the margins, what is (or is not) "adverse employment action" is murky. *See Bell, 6 F.4th at 1379*. *Bell* introduced additional uncertainty into the definition of "adverse employment action." And, although one could conclude that *Bell* is distinguishable, it remains true that the conduct in *Bell*—suspension with pay pending further proceedings—is like Noriega's conduct—suspension with pay pending termination proceedings. *See id.* Because we determined that, in that context, such conduct was *not* "adverse employment action," we cannot say that Noriega was sufficiently on notice that his decision to suspend Acevedo with pay pending a decision on his termination by the City Commission implicated Acevedo's First Amendment rights.

**IV.**

For the foregoing reasons, we **AFFIRM** the district court's denial of the defendant Commissioners' motions to dismiss, and we **REVERSE** the court's denial of Manager Noriega's motion and **REMAND** for further proceedings consistent with this opinion.

---

**End of Document**